## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Equal Employment Opportunity Commission,**

       **Plaintiff,**

**Kent Duty,**

       **Plaintiff-Intervenor,**         **Case No. 12-2634-JWL**

**v.**

**BNSF Railway Company,**

       **Defendant.**

## MEMORANDUM & ORDER

The Equal Employment Opportunity Commission (EEOC) filed suit against defendant BNSF Railway Company ("BNSF") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., alleging that BNSF discriminated against a job applicant on the basis of the applicant's actual or perceived disability when BNSF revoked a conditional offer of employment based on the results of a post-offer medical evaluation. The EEOC further claims that BNSF violated the ADA by using the results of the pre-employment medical examination to disqualify the applicant from the position. The job applicant, Kent Duty, intervened in the lawsuit, alleging the same disability discrimination claims and the same "medical examination" claim as set forth by the EEOC and asserting one additional claim under the ADA—namely, that BNSF failed to engage in an interactive process with Mr. Duty to assess adequately his abilities to perform the job and to address BNSF's safety concerns. This matter is presently before the

court on BNSF's motion for summary judgment on all claims (doc. 240).  As will be explained, the motion is granted.[1]

## I.   Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiffs EEOC and Mr. Duty, as the non-moving parties.  Plaintiff Kent Duty, at the age of sixteen, suffered injuries to his right arm as a result of a car accident.  Those injuries, which occurred in 1986, included damage to the nerves and muscles in his right arm.  The impairment to Mr. Duty's right arm is visually apparent with obvious wasting of the right forearm and a right "clawhand" in that he has structural shortening of some of the joints in his right hand.  Mr. Duty does not have the ability to actively oppose his thumb and he does not have strength in his hand to apply pressure with his thumb.  Mr. Duty's grip strength for his right hand registers "0." Mr. Duty's right arm reached its maximum medical improvement in 1988.

Prior to the accident, Mr. Duty was a right-hand dominant individual.  After the accident, Mr. Duty became left-hand dominant with the help of physical therapy.  Because of the limitations in the function of his right arm and hand, Mr. Duty uses his right hand primarily to provide "gross assist" as a "helper" hand; he cannot use his right hand for fine motor activities. Mr. Duty has adapted to the limited use of his right hand by accomplishing tasks in a manner that is different from someone who has full use of his or her right hand.  For example, Mr. Duty turns his car key with his left hand; types one-handed with his left hand; and puts on a belt with

---

[1] BNSF has also filed a motion to exclude the testimony of EEOC and Mr. Duty's expert witnesses.  Because summary judgment is appropriate on all claims regardless of the admissibility of this testimony, the motion to exclude expert testimony is moot.

only his left hand.  When he brushes his teeth, Mr. Duty places the toothbrush in his right hand, applies toothpaste using his left hand, then takes the toothbrush out of his right hand and brushes his teeth by holding the brush with his left hand.  Because Mr. Duty cannot button the cuff on the left-hand sleeve of his shirts, he buttons the cuff with his left hand then squeezes his left hand through the buttoned shirt sleeve.  Mr. Duty also folds sheets and ties knots differently because of the impairment to his right hand.

In 1992, Mr. Duty began a successful career performing maintenance and electrical work. In fact, Mr. Duty has performed such work for the same employer (though that company has changed hands over the years) for more than 20 years and he remains employed today as a maintenance technician, performing a wide range of electrical work for his employer.  In the summer of 2008, Mr. Duty applied for the position of Locomotive Electrician at BNSF's Argentine, Kansas Locomotive Maintenance and Inspection Terminal.  According to the job posting for the position, a locomotive electrician is required to test, inspect and properly repair the electrical components of locomotive systems, equipment and machinery; must follow safety policies and procedures; and must frequently climb on and off locomotives and other equipment. Mr. Duty was interviewed by Earl Bunce, the general foreman at the Argentine facility, and Darrell Patterson, a 25-year BNSF locomotive electrician and, at the time, President of the IBEW Local 866.  Although Mr. Duty's impairment was obvious to the interview panel, the panel was not charged with ascertaining whether Mr. Duty was medically qualified to perform the locomotive electrician job; rather, they were charged only with ascertaining whether Mr. Duty had sufficient electrical knowledge and skills to qualify for the position.  The interview

panel concluded that Mr. Duty had adequate skills and experience performing electrical work and BNSF extended a job offer to Mr. Duty.

Consistent with BNSF's regular practice, the job offer extended to Mr. Duty was conditioned on the successful completion of BNSF's post-offer, pre-employment medical evaluation process.    That medical evaluation process is initiated and coordinated by Comprehensive Health Services 9CHS), a third-party contractor.  CHS gathers initial medical information from BNSF candidates who have received conditional offers of employment and arranges for an initial medical examination.  The initial information gathered by CHS from Mr. Duty revealed both a vision deficiency and a physical limitation with respect to Mr. Duty's right hand.  The vision deficiency was quickly resolved and is not at issue in this case.  With respect to the physical limitation identified by CHS, CHS facilitated Mr. Duty's participation in a medical examination with a CHS-contracted physician, Dr. Gil Wright.  Dr. Wright's report indicated that Mr. Duty had limitations in the range of motion in his right hand and wrist; decreased sensation of the right forearm and hand; and fairly significant functionality limitations in the right hand.  Because the limitations noted by Dr. Wright required additional review by BNSF, CHS transmitted the information they had gathered about Mr. Duty to BNSF's Medical Department and, more specifically, to Dr. Michael Jarrard, BNSF's Chief Medical Officer.

When Dr. Jarrard reviewed Dr. Wright's report from CHS, he concluded that he needed more formal testing of Mr. Duty's right hand and wrist limitations to determine whether Mr. Duty could safely perform the locomotive electrician job.  Toward that end, BNSF's medical department sent an email in September 2008 to Mr. Duty stating in pertinent part as follows:

4

> The BNSF Medical Review is unable to determine medical qualification for the Locomotive Electrician position at this time due to uncertain functional abilities of right hand/wrist. You can be reconsidered if you supply a current Functional Capacity Evaluation of your right hand and arm.
>
> The complete report from a Physical or Occupational Therapist must include at a minimum full range of motion measurements, grip strength using a Jamar dynamometer, pinch grip, palmer grip and finger tip dexterity assessments. If you supply this, we can evaluate your condition again.

That same day, Mr. Duty forwarded the email to BNSF's human resources department and requested a "complete job description and physical requirements" of the position. According to Mr. Duty, he requested the information so that he might have an opportunity to respond to BNSF's concern that he could not perform certain aspects of the locomotive electrician position. BNSF did not respond to Mr. Duty's email request and it never provided a job description or identified the physical requirements of the position aside from the job posting mentioned above. When Mr. Duty contacted BNSF to inquire whether additional testing was necessary in light of the testing performed by Dr. Wright, a BNSF representative advised him that it was.

Mr. Duty, then, obtained the requested assessment from Scott Woods and provided the report to BNSF. Mr. Woods found that Mr. Duty demonstrated "minimal if any" voluntary control of his right thumb, index finger, middle finger or ring finger with "limited active movement" present in his right small finger. The report from Mr. Woods confirmed that Mr. Duty had virtually no grip strength in his right hand. Mr. Woods observed that Mr. Duty had the ability to utilize a "functional hook grip" to handle materials with his right arm and hand.

Following his review of Mr. Woods' report, Dr. Jarrard, through CHS, sent an email to Mr. Duty on December 29, 2008 in which he advised Mr. Duty that he was not medically qualified for the locomotive electrician position

5

> due to significant risks associated with lack of grip strength in your right hand, including safety concerns such as your inability to support your body weight with one hand during mandatory three point contact when climbing on and off locomotives.  You may be qualified for other BNSF positions such as dispatcher, yard master or clerk should you choose to apply and other positions be available.

According to BNSF's Mechanical Safety Rules, the "three-point contact" rule referenced by Dr. Jarrard in his email requires that employees maintain three-point contact (consisting of both feet and one hand or both hands and one foot) when getting on or off vehicles, equipment and machinery and when ascending or descending ladders or platforms.  While the rule permits the use of both feet and one hand, both hands are necessarily required to get up and down the iron rungs (or "grab irons") on the side of a locomotive.  As described by Mr. Bunce, three-point contact requires a "constant grip" with the hands.  When asked to elaborate in his deposition, Mr. Bunce explained:

> Where you can hold your weight with either/or [sic] hand while you're going up or down the steps.  Because you have to move one hand at a time, a step at a time, and the hand you're using has got to be able to hold your weight from falling backwards.

In his deposition, Dr. Jarrard similarly testified that compliance with the three-point contact rule requires "a firm grasp of your hand to control your body weight."  An August 7, 2008 BNSF Safety Briefing related to the three-point contact rule includes photographs that depict employees ascending and descending locomotives using a firm grip with both hands.  Nonetheless, it is undisputed that the record contains no evidence that BNSF, in writing, requires a firm grip or grasp sufficient to support an employee's body weight to comply with the three-point contact rule.

6

In February 2009, Mr. Duty filed a charge of discrimination with the Kansas Human Rights Commission, which was dual filed with the EEOC, alleging that BNSF discriminated against him on the basis of his disability when it failed to hire him for the locomotive electrician position.  Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.     Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted).  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III.    Disability Discrimination

In the pretrial order, EEOC and Mr. Duty assert a claim for disability discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.  According to EEOC and Mr. Duty, BNSF failed to hire Mr. Duty and revoked its conditional offer of

employment on the basis of Mr. Duty's disability.   To establish a prima facie case of employment discrimination under the ADA, EEOC and Mr. Duty must present evidence that (1) Mr. Duty is disabled within the meaning of the ADA; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job he holds or desires; and (3) BNSF discriminated against him because of his disability.   *Jones v. UPS, Inc.*, 502 F.3d 1176, 1189 (10th Cir. 2007).   BNSF moves for summary judgment on this claim on the grounds that EEOC and Mr. Duty have failed to establish a genuine issue of material fact as to the first and second elements of the prima facie case.   As will be explained, EEOC and Mr. Duty have failed to demonstrate a genuine issue of material fact concerning whether Mr. Duty is actually disabled or whether BNSF regarded Mr. Duty as disabled within the meaning of the ADA.   The court, then, grants summary judgment on these claims and declines to address whether Mr. Duty is qualified, with or without accommodation, to perform the essential functions of the locomotive electrician position.[2]

As for the first element, Congress provided three statutory definitions for "disability" under the ADA:   A plaintiff may show either "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.*   (quoting 42 U.S.C. § 12102(1)).   In their submission, EEOC and Mr. Duty contend that Mr. Duty is disabled

---

[2] Although the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) generally applies in ADA cases, the parties agree that the framework has little application here because it is undisputed that BNSF made its employment decision based on Mr. Duty's physical impairment such that the disability discrimination claim turns only on whether plaintiff is a "qualified individual with a disability."   *See Hawkins v. Schwan's Home Serv.*, 778 F.3d 877, 883-84 (10th Cir. 2015); *Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152, 1164-65 (10th Cir. 2002).

for purposes of the ADA under subsections (A) and (C).  In its motion for summary judgment, BNSF contends that summary judgment is appropriate because EEOC and Mr. Duty have come forward with insufficient evidence to establish that Mr. Duty is disabled such that the prima facie case fails as to the first element.  As will be explained, no jury could conclude based on the undisputed evidence that plaintiff is disabled under prong (A) or (C) of the statutory definition. The court, then, grants BNSF's motion for summary judgment on this claim.

A.    *Actual Disability*

To demonstrate an actual disability under subsection (A), plaintiff must have a recognized impairment, must identify one or more appropriate major life activities, and show that the impairment substantially limits one or more of those activities.  *Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014).  It is undisputed that Mr. Duty has a physical impairment and functional limitations relating to his right hand.  According to EEOC and Mr. Duty, this impairment constitutes a disability for purposes of the ADA because it substantially limits Mr. Duty's ability to perform manual tasks.  Performing manual tasks is a major life activity under the ADA so long as "the manual tasks in question are central to daily life." *Carter v. Pathfinder Energy Servs., Inc*., 662 F.3d 1134, 1143 (10th Cir. 2011) (citing *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002), *superseded by statute*, ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553).  EEOC and Mr. Duty do not identify any other major life activity affected by Mr. Duty's impairment.

The court, then, turns to the question of whether EEOC and Mr. Duty have presented sufficient evidence to create a genuine dispute as to any material fact concerning whether his physical impairment "substantially limits" his ability to perform manual tasks. *See id*. at 1143. An impairment is "substantially limiting" when it "renders an individual either unable or significantly restricted in her ability to perform a major life activity compared to the average person in the general population." *Id*. (quoting *Johnson v. Weld County*, 594 F.3d 1202, 1218 (10th Cir. 2010)). Under the Supreme Court's decision in *Sutton v. United Air Lines, Inc*., 527 U.S. 471 (1999), the question of Mr. Duty's substantial limitation is analyzed with reference to measures that mitigate his impairment. *Id*. at 1144.[3] In other words, the determination of whether Mr. Duty is disabled under the ADA depends on whether the limitations he actually faces are in fact substantially limiting. *See id.*

To be substantially limited in performing manual tasks, Mr. Duty's impairment must "prevent or severely restrict" him from doing activities that are of central importance to most people's daily lives. *Williams*, 534 U.S. at 198. Impairments that "interfere only in a minor way with the performance of manual tasks" do not qualify as disabilities under the ADA. *Id.* at 197. Household chores, bathing and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives and should be part of the assessment of whether a plaintiff is substantially limited in performing manual tasks. *Id*. at 202. There is no evidence in

---

[3] In 2008, Congress amended the ADA to correct what it viewed as an overly restrictive interpretation of the statute's terms that had been adopted by the Supreme Court in *Sutton v. United Air Lines, Inc*., 527 U.S. 471 (1999), and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002). *See Carter v. Pathfinder Energy Servs., Inc*., 662 F.3d 1134, 1144 (10th Cir. 2011). Because the allegedly discriminatory conduct in this case took place before those amendments, and because the amendments are not retroactive, the parties agree that the court must resolve the "disability" issue by applying the law as it stood prior to the amendments.

the record that Mr. Duty's impairment prevents him from doing activities that are of central importance to most people's daily lives.   While Mr. Duty testified that his impairment prevents him from rock climbing and giving his wife a two-handed massage, neither EEOC nor Mr. Duty suggest that these activities are central to most people's daily lives.   In support of the argument that Mr. Duty's impairment severely restricts his ability to perform manual tasks, EEOC and Mr. Duty have marshaled the following evidence:

- Mr. Duty turns his car keys with his left hand

- Mr. Duty types with only his left hand

- Mr. Duty puts on his belt with only his left hand

- Mr. Duty ties his shoes primarily with his left hand, using his right hand to assist

- Mr. Duty cannot button the left-hand cuff of a dress shirt

- When brushing his teeth, Mr. Duty places his toothbrush in his right hand, uses his left hand to apply toothpaste to the brush, then moves the toothbrush to his left hand to brush his teeth

- When carrying more than two drinks, Mr. Duty holds those drinks against the side of his body with his right arm

- When clipping the fingernails of his left hand, Mr. Duty places the clippers on his knee and uses his right hand to push down on the lever

As described by Mr. Duty, he has become left-hand dominant by necessity and typically uses his right hand as a "helper" hand.   In essence, Mr. Duty contends that he has adapted to the limited

11

use of his right hand by compensating with his fully functional left hand and by accomplishing things in a manner that is different from someone who has full use of his or her right hand.

The evidence submitted by EEOC and Mr. Duty is not sufficient to permit a reasonable jury to conclude that Mr. Duty's impairment severely restricts his ability to perform manual tasks. To be sure, Mr. Duty is required to accomplish many tasks differently than most people in the general population. But the Supreme Court has cautioned that a mere "difference" in the manner in which a person performs a major life activity is not the same as a "significant restriction" on that person's abilities. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999). Nonetheless, EEOC and Mr. Duty contend that Mr. Duty's successful efforts to "work around" his impairment do not alleviate the seriousness of his impairment and should not be construed as "mitigating measures" in determining whether he is disabled. Toward that end, EEOC and Mr. Duty analogize the facts of this case to the facts presented in *Stillwell v. Kansas City, Missouri Board of Police Comm'rs*, 872 F. Supp. 682 (W.D. Mo. 1995) and *Bartlett v. New York State Bd. of Law Examiners*, 2001 WL 930792 (S.D.N.Y. Aug. 15, 2001). As will be explained, those cases are not persuasive to the court.

In *Stillwell*, the district court on summary judgment concluded that the plaintiff had a disability under the ADA where the plaintiff, born without a left hand, "had to adjust the way he performs manual tasks in comparison to most people" and to accommodate "his having only one hand." 872 F. Supp. at 685. The court did not discuss any of the record evidence concerning the plaintiff's specific abilities to perform manual tasks and, because the case was decided prior to the Supreme Court's decisions in *Sutton* and *Williams*, did not discuss the nature or significance of any mitigating measures adopted by the plaintiff. *Stillwell* is also distinguished

12

from the facts here in one key respect—the plaintiff in *Stillwell* suffered the anatomical loss of his left hand as opposed to limited functionality in that hand.  While Mr. Duty undoubtedly has limited functionality in his right hand, it is undisputed that he is able to perform many tasks through the use of both hands.

In *Bartlett*, the district court determined that the plaintiff's learning disability substantially limited plaintiff's major life activity of reading when compared to the average reader in light of her slow reading rate and the fatigue caused by her inability to read with automaticity.  2001 WL 930792, at *3.  In so finding, the district court found that while the plaintiff utilized a number of self-accommodating techniques that allowed her to read despite her impairment, those techniques did not "correct" her disability in the same way that glasses or the body's internal systems can correct or compensate for impaired vision.  *Id.* at *33.  The court, then, found it necessary to distinguish between those mitigating measures that the plaintiff used that affected her ability to read and those that merely assisted her in functioning in her daily life.  *Id.*  Ultimately, the court found that the effect of the plaintiff's reading impairment on her life, even with all of her self-accommodations, was "profound" and that she was substantially limited in the major life activity of reading.  *Id.* at *36 (noting that the plaintiff had much difficulty with tasks that most people performed effortlessly, like reading short-emails, using a telephone directory, writing a shopping list and following a recipe).

The court finds that *Bartlett* has little application to the facts of this case.  To the extent it might be applied outside the context of an individual who suffers from a learning disability (and the court has uncovered no case applying *Bartlett* outside that context), *Bartlett* is distinguished from the facts here because the plaintiff in *Bartlett*, despite mitigating measures, nonetheless

13

suffered from a significant reading impairment.  In contrast, EEOC and Mr. Duty have come

forward with no evidence that Mr. Duty, despite mitigating measures, suffers from a significant

or severe impairment in his ability to perform manual tasks.  Mr. Duty did not testify that any

tasks take him longer to complete or that any tasks are difficult for him to complete.  Rather, he

summed up his abilities as follows:

> You know when I think about it, anything you probably do with two hands, in
> some manner or form or fashion I do it differently just because I can't use my right
> hand as well and it's a lot of things that I just don't ever think of just because I do
> it every day and it's a natural thing for me to do.

By Mr. Duty's own account and to his credit, then, Mr. Duty has "learned successfully to live

with his impaired arm" such that he has no significant restriction in his ability to perform

manual tasks.  *See Carr v. Publix Super Markets, Inc.*, 170 Fed. Appx. 57, 60 (11th Cir. 2006)

(no actual disability under ADA where plaintiff "learned successfully to live with his impaired

arm in a manner that little restricts" his major life activities by compensating with his fully-

functional left hand).

   Additional testimony provided by Mr. Duty demonstrates that Mr. Duty's impairment

does not substantially limit his ability to perform manual tasks.  He admits that his right hand is

functional and that he can perform tasks with his right hand that involve holding, grasping,

turning and pulling.  He testified, for example, that he is able to do a wide range of manual tasks

including yard work; washing dishes; cooking; performing household chores such as

vacuuming, dusting and "picking up stuff"; driving a car; and showering and bathing.  It is

undisputed that Mr. Duty does not need any assistance with any activities of daily living. The

facts of this case, then, are analogous to those facts addressed by the Tenth Circuit in *Holt v.*

*Grand Lake Mental Health Center, Inc*., 443 F.3d 762 (10th Cir. 2006).  In *Holt*, the Circuit affirmed the district court's grant of summary judgment to the defendant on the plaintiff's ADA claim where the record reflected that the plaintiff's cerebral palsy affected her ability to perform certain activities which required fine motor coordination but did not severely restrict the plaintiff's ability to perform a broad range of manual tasks.  *Id*. at 766.  As explained by the Circuit:

> For example, Holt is unable to perform the specific task of cutting her own nails, but she has presented no evidence that would allow a factfinder to conclude she is severely restricted in her ability to perform other manual tasks relating to personal hygiene.  While Holt needs help when chopping, cutting, and slicing food, the evidence is insufficient to allow a factfinder to conclude she is severely restricted in her ability to cook.  It is undisputed that Holt occasionally must ask others for assistance when buttoning her clothing; Holt has introduced no evidence, however, that would permit a factfinder to conclude she is severely restricted in dressing herself.  In short, based on the evidence presented, a rational jury could not find Holt is substantially limited in her ability to perform manual tasks.

*Id.* at 767 (footnote omitted).  As indicated by the Circuit in *Holt*, a plaintiff claiming a severe restriction in the ability to perform manual tasks must do more than show a restriction from doing a few specific tasks; he or she must demonstrate a substantial limitation in a range of manual tasks.  *Id*. at 766 (noting that courts have granted summary judgment to employers when the evidence shows a plaintiff is restricted from doing a few specific tasks but can otherwise perform a variety of manual activities); *accord Rakity v. Dillon Cos., Inc*., 302 F.3d 1152 (10th Cir. 2002) (plaintiff with carpal tunnel syndrome did not have a record of a substantial limitation in ability to perform manual tasks where plaintiff performed light house work, prepared his own meals and grocery shopped and occupational therapists opined that plaintiff's normal activities of daily living were not impaired).  While EEOC and Mr. Duty attempt to distinguish these

cases by arguing that Mr. Duty's impairment is more severe than the impairments at issue in *Holt* and *Rakity*, the severity of Mr. Duty's impairment does not dictate whether he is severely restricted in his ability to perform manual tasks.  On that critical issue, EEOC and Mr. Duty have not presented sufficient evidence to permit a jury to find a severe restriction in Mr. Duty's ability to perform a range of manual tasks.

On this record, plaintiff cannot satisfy the rigorous standard for proving an actual disability set forth by the Supreme Court in *Williams*.  Thus, the court grants summary judgment in favor of BNSF on EEOC and Mr. Duty's claim that Mr. Duty suffers from an actual disability under the ADA.  *See Didier v. Schwan Food Co*., 465 F.3d 838, 841-42 (8th Cir. 2006) (plaintiff was not disabled for purposes of ADA where evidence demonstrated that, despite right-arm impairment, plaintiff had "learned to do things left-handed" and could take care of himself and perform household chores with one or both hands); *Casey v. Kwik Trip, Inc*., 114 Fed. Appx. 215, 216-18 (7th Cir. 2004) (plaintiff with carpal tunnel syndrome was not disabled under ADA where plaintiff was able to perform tasks by using "simple, common-sense, and efficient adaptive measures" such as using her left hand or both hands); *Nealy v. Patterson Dental Supply, Inc*., 2005 WL 3132182, at *4 (S.D. Tex. Nov. 22, 2005) (plaintiff with significant impairment to right hand as a result of injury was not disabled under ADA where impairment made certain daily activities difficult to perform but did not severely restrict plaintiff from performing those activities; plaintiff testified that she compensated for her injured hand by relying more on her other hand).

B.      *Regarded as Disabled*

To demonstrate that BNSF regarded Mr. Duty as disabled, EEOC and Mr. Duty must show that BNSF believed either that Mr. Duty has a substantially limiting impairment that he does not have or that Mr. Duty has a substantially limiting impairment when, in fact, the impairment is not so limiting. *Dillon v. Mountain Coal Co.*, 569 F.3d 1215, 1218 (10th Cir. 2009) (citing *Jones v. United Parcel Service, Inc.*, 502 F.3d 1176, 1190 (10th Cir. 2007)). In the pretrial order, EEOC and Mr. Duty contend that BNSF believed, based on the impairments to Mr. Duty's right arm and hand, that Mr. Duty was substantially limited in the major life activities of performing manual tasks and working.

1.    *Whether BNSF Regarded Mr. Duty as Substantially Limited in his Ability to Perform Manual Tasks*

The court begins with EEOC and Mr. Duty's contention that BNSF believed that Mr. Duty "was unable to grip in any way with his right hand" such that BNSF regarded Mr. Duty was disabled in the major life activity of performing manual tasks. Viewing the evidence in the light most favorable to EEOC and Mr. Duty, a reasonable jury could conclude that Dr. Jarrard believed that Mr. Duty had no grip strength in his right hand. But no reasonable jury could make the inferential leap that Dr. Jarrard believed that Mr. Duty was unable or severely restricted in his ability to perform activities that are central to most people's daily lives.

In support of their argument, EEOC and Mr. Duty urge that Dr. Jarrard's beliefs about Mr. Duty's inability to grip with his right hand is equivalent to a belief that Mr. Duty is unable to use his right hand at all. EEOC and Mr. Duty again rely on *Stillwell v. Kansas City, Missouri Board of Police Comm'rs*, 872 F. Supp. 682 (W.D. Mo. 1995). For the same reason that

*Stillwell* was not persuasive to the court in connection with showing that Mr. Duty suffers from an actual disability, the court is not persuaded by *Stillwell* in connection with EEOC and Mr. Duty's perceived disability claim.  Most notably, the plaintiff in *Stillwell* suffered the anatomical loss of his left hand as opposed to limited functionality in that hand.   While Mr. Duty undoubtedly has limited functionality in his right hand, it is undisputed that he is able to perform many tasks through the use of both hands and that he can perform all activities that would be considered central to most people's daily lives by compensating with his left hand or by using both hands.

Moreover, there is no evidence that Dr. Jarrard, even if he believed that Mr. Duty lacked the ability to grip with his right hand, believed that Mr. Duty was limited in his ability to perform tasks that are central to most people's daily lives.  EEOC and Mr. Duty direct the court to no case, and the court has found none, in which an employer's belief that a plaintiff was unable to grip with one hand was sufficient to establish a perceived disability based on a perceived limitation in the ability to perform manual tasks.  Significantly, there is no evidence in the record suggesting that Dr. Jarrard considered Mr. Duty's lack of grip strength in connection with anything other than Mr. Duty's qualifications for the locomotive electrician position.  For these reasons, summary judgment is appropriate on EEOC and Mr. Duty's claim that BNSF regarded Mr. Duty as substantially limited in his ability to perform manual tasks.  *See Casey v. Kwik Trip, Inc.*, 114 Fed. Appx. 215, 221 (7th Cir. 2004) (granting summary judgment on perceived disability claim where employer's comments did not speak to employee's ability to perform manual tasks); *Rakity v. Dillon Companies, Inc*., 302 F.3d 1152 (10th Cir. 2002) (affirming grant of summary judgment where employee presented no evidence indicating that

employer mistakenly believed that employee could not perform manual tasks that are centrally important to most people's lives; evidence did not speak to employer's beliefs with respect to tasks such as household chores, bathing or brushing teeth).

2.     *Whether BNSF Regarded Mr. Duty as Substantially Limited in his Ability to Perform a Class of Jobs or a Broad Range of Jobs in Various Classes*

To prevail on their claim that BNSF regarded Mr. Duty as substantially limited in the major life activity of working, EEOC and Mr. Duty must demonstrate that BNSF regarded Mr. Duty as significantly restricted in performing either (1) a class of jobs; or (2) a broad range of jobs in various classes.  *See Dillon v. Mountain Coal Co*., 569 F.3d 1215, 1218 (10th Cir. 2009) (citing *EEOC v. Heartway Corp*., 466 F.3d 1156, 1163 (10th Cir. 2006) (holding that "there must be sufficient evidence that the employer subjectively believed the employee to be significantly restricted as to a class of jobs or broad range of jobs in various classes.").  The EEOC's regulations define a "class of jobs" as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment."  *Id*. (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)).  A "broad range of jobs" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment."  *Id*. at 1218-19 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(C)).

The court, then, evaluates EEOC and Mr. Duty's "regarded as" claims under the ADA by using a two-step inquiry. *Id*. at 1219. First, the court determines whether BNSF regarded Mr. Duty as significantly restricted in performing the locomotive electrician job because of his impairment. *See id*. (citing *Heartway*, 466 F.3d at 1165).[4] Next, the court determines whether BNSF subjectively believed that Mr. Duty was significantly restricted in performing either a class of jobs or a broad range of jobs in various classes. *See id*. (citing *Heartway*, 466 F.3d at 1163). Because this type of claim rests heavily on BNSF's subjective state of mind, it is "extraordinarily difficult" to prove:

> Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind. Thus, proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult.

*Id*. (quoting *Heartway*, 466 F.3d at 1162). In analyzing whether BNSF regarded Mr. Duty as substantially limited in his ability to work, the court considers any evidence that might "shed light" on the employer's state of mind at the time of the decision. *See Justice v. Crown Cork & Seal Co*., 527 F.3d 1080, 1088 (10th Cir. 2008) (evidence that employer, three years after decision to reassign electrician to janitor job based on problems maintaining balance, refused to consider electrician for any openings in the plant "may . . . shed light on Crown's state of mind at the time" of the reassignment decision); *Heartway*, 466 F.3d at 1165 n.9 ("Even though [the

---

[4] This issue is not disputed—Dr. Jarrard clearly believed that Mr. Duty was significantly restricted in performing the locomotive electrician job because of his impairment.

employer's] comments . . . took place four months after [the plaintiff] was terminated, a jury could reasonably infer that those comments were indicative of his beliefs at the time that he terminated [the plaintiff].").

In support of their argument that BNSF regarded Mr. Duty as substantially limited in his ability to work, EEOC and Mr. Duty contend that BNSF's medical director, Dr. Jarrard, believed that Mr. Duty's impairment prevented him from firmly gripping tools with both hands and from climbing ladders in compliance with an industry-wide three-point contact safety rule. According to EEOC and Mr. Duty, Dr. Jarrard's belief that Mr. Duty could not firmly grip tools with both hands and his belief that Mr. Duty could not climb ladders in compliance with an industry-wide safety rule is sufficient to show that BNSF regarded Mr. Duty as substantially limited in working those jobs requiring such skills.  EEOC and Mr. Duty have come forward with expert testimony suggesting that if Mr. Duty could not "use two hands on tools" or climb ladders consistent with industry safety rules then he would be precluded from both a class of jobs and a broad range of jobs in various classes.  Because the evidence viewed in the light most favorable to EEOC and Mr. Duty does not permit an inference that BNSF or Dr. Jarrard believed that Mr. Duty's impairment substantially limited his ability to work in either a class of jobs or a broad range of jobs in various classes, the court grants summary judgment in favor of BNSF on plaintiffs' "regarded as" claim.


a.      *BNSF's Belief that Mr. Duty Could Not Firmly Grip Tools with Both Hands*

The court begins with EEOC and Mr. Duty's contention that Dr. Jarrard believed that Mr. Duty's impairment prevented him from firmly gripping tools with both hands.  EEOC and Mr.

Duty rely primarily on one piece of evidence to support this contention—BNSF's position statement submitted to the EEOC more than nine months after the employment decision. In that position statement, Tamala Cleaver, a human resources manager with BNSF, stated that Dr. Jarrard made the determination that Mr. Duty was not medically qualified for the locomotive electrician position and that Dr. Jarrard made that determination "due to lack of right hand strength and hand movement." After providing a detailed summary of Mr. Duty's functional assessment as it related to the locomotive electrician position, Ms. Cleaver summarized as follows:

> More specifically, Mr. Duty's impairment posed a significant safety risk with respect to the job tasks of climbing on/off locomotives and other equipment as well as firmly gripping hand tools with both hands.

The source of Ms. Cleaver's statement about "firmly gripping hand tools" is unclear. While Ms. Cleaver testified that she consulted with Dr. Jarrard in connection with responding to the EEOC, she could not recall whether Dr. Jarrard reviewed the position statement that she drafted. In his December 2008 email in which he determined that Mr. Duty was not medically qualified for the position, Dr. Jarrard made no reference to hand tools and noted only a "lack of grip strength" in Mr. Duty's right hand. EEOC and Mr. Duty point to no evidence suggesting that Dr. Jarrard, at any time, made any statements or even considered Mr. Duty's ability to firmly grip hand tools with both hands in connection with the employment decision. No reasonable jury, then, could attribute to Dr. Jarrard—the sole decisionmaker—Ms. Cleaver's statement about Mr. Duty's ability to firmly grip hand tools with both hands.

To the extent Ms. Cleaver's statement indicates a belief that BNSF generally (as opposed to Dr. Jarrard specifically) believed that Mr. Duty could not safely grip hand tools with both

22

hands,[5] that statement, standing alone, is not sufficient to permit a jury to conclude that BNSF believed that Mr. Duty was substantially limited in his ability to work.  Ms. Cleaver's statement is expressly tied to the specific job tasks of the locomotive electrician position.  Moreover, even assuming that BNSF believed that Mr. Duty could not firmly grip tools with both hands, there is no evidence suggesting that BNSF perceived Mr. Duty as significantly restricted in performing either a class of jobs or a broad range of jobs in various classes.  There is no evidence that anyone at BNSF considered at all Mr. Duty's ability to perform other jobs other than the locomotive electrician job.

In any event, while plaintiffs' expert purports to identify numerous jobs from which plaintiff would be precluded if, in fact, he could not firmly grip tools with both hands, plaintiffs' expert testified only about those jobs that require workers to "use their hands to handle, control or feel objects, tools or controls" and suggested that Mr. Duty would be excluded from those jobs based on BNSF's perception of his inability to firmly grip tools with both hands.  But plaintiffs' expert cannot reasonably leap from an inability to grip tools firmly with both hands to a broad exclusion from any job that requires "use" of the hands.  There is simply no evidence suggesting that anyone at BNSF, including Dr. Jarrard, perceived Mr. Duty as limited in the "use" of his hands.  And plaintiffs direct the court to no cases in which a perceived inability to grip tools firmly was sufficient to support a claim that the employer regarded the employee as substantially limited in the major life activity of working.  For the foregoing reasons, no

---

[5] Neither EEOC nor Mr. Duty explains how the statements of a non-decisionmaker such as Ms. Cleaver could prove BNSF regarded Mr. Duty has disabled.  *See Rakity v. Dillon Cos.*, 302 F.3d 1152, 1163 (10th Cir. 2002) (evidence concerning non-decisionmaker's beliefs about limitations were "immaterial" in assessing whether employer regarded employee as disabled).

reasonable jury could conclude that BNSF, based on its perception of Mr. Duty's ability to grip tools firmly with both hands, regarded Mr. Duty as substantially limited in the major life activity of working. *See EEOC v. BNSF Railway Co.*, 211 Fed. Appx. 682, 686 (10th Cir. 2006) (affirming district court's conclusion that Dr. Jarrard's determination that applicant had diminished grip strength in left hand and weakness in left arm did not demonstrate that BNSF regarded applicant as significantly restricted in his ability to perform a class of jobs and no reasonable jury could conclude that BNSF's decision regarding the plaintiff applied to a "class of jobs").

b.     *BNSF's Belief that Mr. Duty Could Not Comply with the Three-Point Contact Rule*

The court turns to EEOC and Mr. Duty's contention that Dr. Jarrard believed that Mr. Duty's impairment prevented him from climbing ladders in compliance with an industry-wide three-point contact safety rule such that BNSF regarded Mr. Duty as unable to perform a class of jobs or a broad range of jobs in various classes.  In an effort to ascertain what Dr. Jarrard believed about Mr. Duty's impairment, the court begins with Dr. Jarrard's December 2008 email in which he advised Mr. Duty that he was not medically qualified for the locomotive electrician position.  In its entirety, that email reads:

> Not medically qualified for Locomotive Electrician position due to significant risks associated with lack of grip strength in your right hand, including safety concerns such as your inability to support your body weight with one hand during mandatory three point contact when climbing on and off locomotives.  You may be qualified for other BNSF positions such as dispatcher, yard master or clerk should you choose to apply and other positions be available.

Regarding the three-point contact rule, BNSF's position statement to the EEOC, drafted by Ms. Cleaver, states as follow:

> More specifically, Mr. Duty's impairment posed a significant safety risk with respect to the job tasks of climbing on/off locomotives and other equipment as well as firmly gripping hand tools with both hands. BNSF rules require that an employee maintain three-point contact when getting off vehicles, equipment and machinery, and when ascending or descending ladders or platforms. Three-point contact requires adequate grip strength in both hands. Enclosed is a copy of the BNSF Mechanical Safety Rules Policy section 1.4.6 (Exhibit D). Accordingly, BNSF rescinded the offer of employment as a Diesel Engine-Locomotive Electrician.

The safety rule referenced in the position statement provides that employees must "[m]aintain three-point contact when getting on or off vehicles, equipment, and machinery, and when ascending or descending ladders or platforms. Three-point contact consists of both feet and one hand or both hands and one foot."

EEOC and Mr. Duty contend that these statements, taken together, are sufficient to create a fact issue on whether BNSF regarded Mr. Duty as substantially limited in the major life activity of working. The court disagrees. On its face, Dr. Jarrard's December 2008 email expresses only Dr. Jarrard's belief (a belief that BNSF obviously does not dispute) that Mr. Duty was not qualified for the locomotive electrician position due to his inability to safely climb on and off locomotives. Similarly, Ms. Cleaver's statements specifically link Mr. Duty's impairment to the job tasks of climbing on and off locomotives. As BNSF points out, however, evidence that an employer believes that an applicant or employee cannot perform a single, specific job or even a group of jobs with the same employer is not sufficient to withstand a motion for summary judgment on a "regarded" claim that relies on the major life activity of working. The Tenth Circuit's case in *EEOC v. BNSF Railway Co.*, 211 Fed. Appx. 682 (10th

Cir.2006), albeit unpublished, is instructive on this point.  In *BNSF Railway*, the district court granted summary judgment in favor of BNSF on a perceived disability claim filed by the EEOC on behalf of an unsuccessful applicant for the conductor trainee position.  *Id*. at 683.  Similar to the facts presented here, Dr. Jarrard in that case determined that the applicant's diminished left-hand grip strength and left-arm weakness disqualified the applicant from all train service positions, as those were the only positions that required, as an essential job function, an employee to hold on to the exterior of a moving train. *Id*. at 683-84.  In rejecting the EEOC's perceived disability claim, the district court held that "train service" jobs did not constitute a "class of jobs" such that BNSF regarded the applicant as substantially limited in the major life activity of working.  *Id*. at 684-86.  In so concluding, the district court emphasized that BNSF determined only that the applicant could not perform a specific task (holding on to the exterior of a moving train) required by the train service positions such that he was not considered excluded from a "class of jobs." *Id*. at 686.  The Tenth Circuit affirmed the district court's entry of summary judgment in favor of BNSF and, more specifically, the district court's conclusion that the plaintiff's exclusion from BNSF's train service jobs was insufficient to demonstrate exclusion from a class of jobs or a broad range of jobs in various classes.

EEOC and Mr. Duty contend that BNSF's reliance here on *BNSF Railway* is misplaced because Dr. Jarrard in this case did not believe only that Mr. Duty could not hold the single position of locomotive electrician but believed, much more broadly, that Mr. Duty could not perform any job that required Mr. Duty to "safely climb ladders."  The evidence in the record does not support this argument.  EEOC and Mr. Duty highlight an interrogatory response submitted by BNSF in which BNSF identifies numerous BNSF jobs "that has as one of its duties

26

or responsibilities the requirement to climb ladders using the three point contact rule." That evidence, however, does not identify which jobs required compliance with the three-point contact rule as an essential function of the job and there is no evidence, then, that BNSF believed that Mr. Duty's impairment necessarily precluded him from performing the jobs identified in the interrogatory response. And even if BNSF believed that Mr. Duty could not perform any job at BNSF that involved climbing on or off locomotives or other equipment specific to BNSF's workplace, which a jury could reasonably infer from the evidence, that belief is not sufficient to create a factual issue on whether BNSF regarded Mr. Duty as substantially limited in performing a class of jobs or a broad range of jobs in various classes. *See id*.

EEOC and Mr. Duty also urge that the facts of this case are much more aligned with this court's decision in *Fox v. BNSF Railway Co*., 2006 WL 3791323 (D. Kan. Dec. 22, 2006). In *Fox*, BNSF withdrew conditional offers of employment as a conductor trainee to two plaintiffs based on the results of post-offer, pre-employment medical examinations. *Id*. at *1-2. Specifically, Dr. Jarrard concluded, with respect to one plaintiff, that the plaintiff's previous lumbar spine fusion surgery presented a "significant risk of future injury" such that he was not medically qualified for the conductor trainee position. *Id*. at *1. With respect to the second plaintiff, Dr. Jarrard similarly concluded that the plaintiff was not medically qualified for the conductor trainee position in light of the plaintiff's rotator cuff tendinitis and the risk of "future injury" in connection with the physical requirements of the conductor trainee position. *Id*. at *2. Plaintiffs alleged in *Fox* that BNSF regarded them as disabled. *Id*. at *3.

In its motion for summary judgment, BNSF argued that plaintiffs could not establish that BNSF regarded them as substantially limited in the major life activity of working and, as here,

relied upon the Tenth Circuit's decision that "train service" jobs did not constitute a "class of jobs" and, as such, BNSF did not regard plaintiffs as substantially limited in their ability to work. *Id.* at *6. This court found the Tenth Circuit's *BNSF Railway* decision distinguishable from the facts presented in *Fox. See id.* Specifically, the court emphasized that the evidence presented in *Fox* was sufficient to permit the inference that BNSF treated both plaintiffs as significantly restricted in their ability to perform any job involving manual labor or heavy lifting. *Id.* at *5.

The factual record before the court in *Fox*, then, was significantly different from the record before the court here. There is no evidence in the record that Dr. Jarrard regarded Mr. Duty as significantly limited in his ability to perform any job other than the locomotive electrician job because of the safety concerns implicated by Mr. Duty's perceived inability to comply with BNSF's three-point contact rule as it relates to that job. Plaintiffs again reference BNSF's interrogatory response listing numerous jobs that might implicate the need to comply with the three-point contact rule, but that response does not speak to whether Dr. Jarrard considered whether Mr. Duty would be precluded from performing those jobs in the absence of evidence that those jobs included, as an essential function of the position, the ability to comply with the three-point contact rule. There is simply no evidence that Dr. Jarrard gave any thought to other jobs from which Mr. Duty would be precluded.

EEOC urges that BNSF's belief that Mr. Duty could not comply with BNSF's three-point contact rule necessarily means that BNSF believed that Mr. Duty could not comply with the three-point contact rule that is utilized by numerous employers and agencies across industries. The court has uncovered no case law supporting this argument. In fact, the cases suggest just

the opposition.  In *Jones v. United Parcel Service, Inc.*, 502 F.3d 1176 (10th Cir. 2007), the plaintiff argued that UPS regarded him as disabled when UPS decided that plaintiff's lifting restrictions prevented plaintiff from returning to his job as a package car driver.  *Id.* at 1191. The Circuit affirmed the district court's conclusion that the record contained insufficient evidence that UPS viewed the plaintiff as substantially limited in the major life activity of working.  *Id.*  In so concluding, the Circuit supported its reasoning with reference to a Seventh Circuit decision, *EEOC v. Schneider Nat'l, Inc.*, 481 F.3d 507, 512 (7th Cir. 2007), in which the Seventh Circuit, as summarized by the Tenth Circuit, reasoned that the "employer did not regard plaintiff as disabled when all available truck-driving jobs at [the] company were subject to [a] safety standard that plaintiff could not meet."  *See id.* at 1192-93.  As explained by the Seventh Circuit in *Schneider*, there was no evidence that the employer regarded the plaintiff as significantly limited in any "life activity" other than driving a truck for the employer—"too esoteric a capability to be judged a 'major' life activity."  481 F.3d at 511.  With respect to the major life activity of working, the Seventh Circuit held that Schneider's decision to exclude the plaintiff from all available truck-driving jobs at the company (all of which had safety standards that the plaintiff could not meet) was insufficient to show that Schneider believed that the plaintiff had a condition that would disable him for working in a broad range of jobs or a class of jobs. *See id.*

As noted by the district court in *Schneider*, it is not reasonable to infer that an employer who determines that an applicant does not meet a company safety standard must therefore believe that the applicant does not meet similar safety standards of other employers.  *EEOC v. Schneider Nat'l, Inc.*, 2006 WL 1519283, at *5-6 (E.D. Wis. May 31, 2006) (one employer's

adoption of standards does not *ipso facto* mean that it believes all other employers would feel the same way). In rejecting EEOC's argument that it "makes no sense" that the employer would differentiate between its own safety standards and those of other employers, the district court looked to *E.E.O.C. v. J.B. Hunt Transport, Inc*., 321 F.3d 69, 75 (2d Cir. 2003) for guidance. As described by the district court, the applicants in *J.B. Hunt* had been denied over-the-road driving positions with J.B. Hunt because of their use of medications with potentially harmful side effects. *Id.* at *5 (citing J.B. Hunt Transport, 321 F.3d at 75). The court, however, found no evidence that the employer viewed the applicants as being unable to drive any trucks for any employer; instead, the court noted that "Hunt dismissed the applicants as unable to meet Hunt's own safety requirements-requirements above and beyond the DOT's industry-wide standards and unique from the requirements of other trucking companies." Id. (citing *J.B. Hunt Transport*, 321 F.3d at 75). The Second Circuit in *J.B. Hunt* held that the company was entitled to adopt and enforce its own standards without necessarily making a judgment about whether the employee might be able to satisfy another company's driving standards. *See id*. The Circuit concluded that "there is no evidence that Hunt's reviewers, relying on Hunt's own DRL and drug lists to make a judgment on qualification for a position at Hunt, intended to make an evaluation beyond Hunt's specific guidelines. Nor is there sufficient evidence to support a finding that Hunt viewed the driving limitation as extending beyond Hunt." *J.B. Hunt Transport*, 321 F.3d at 76.

The same holds true here. EEOC and Mr. Duty may not impute to other employers BNSF's three-point contact rule even if that rule is the same rule maintained by other employers

in the absence of evidence that BNSF or Dr. Jarrard themselves made that leap.  In fact, the

Supreme Court has stated that such a leap is impermissible:

> Even assuming for the sake of argument that the adoption of similar vision requirements by other carriers would represent a substantial limitation on the major life activity of working, the argument is nevertheless flawed. It is not enough to say that if the physical criteria of a single employer were imputed to all similar employers one would be regarded as substantially limited in the major life activity of working only as a result of this imputation. An otherwise valid job requirement, such as a height requirement, does not become invalid simply because it would limit a person's employment opportunities in a substantial way if it were adopted by a substantial number of employers.

*Sutton v. United Air Lines, Inc*., 527 U.S. 471, 493-94 (1999).  Thus, regardless of whether

BNSF's three-point contact rule is more stringent than other employers or whether it is the same

as other employers, BNSF's consideration of that rule in revoking Mr. Duty's offer of

employment cannot be construed, without more, as evidence that BNSF regarded Mr. Duty as

substantially limited in his ability to perform work for any employer who similarly maintains a

three-point contact rule.[6]

The factual record here also lies in contrast to the record analyzed by the Tenth Circuit in

*Justice v. Crown Cork & Seal Co*., 527 F.3d 1080 (10th Cir.2008), another case relied upon by

---

[6] EEOC and Mr. Duty also suggest that Dr. Jarrard purposefully and nefariously lied about what BNSF's three-point contact rule actually requires—in essence, that he "added" the requirement that an applicant needs to be able to grip the grab irons with sufficient strength to support his or her own body weight.  According to EEOC and Mr. Duty, Dr. Jarrard lied about the three-point contact rule as an excuse to discriminate against Mr. Duty on the basis of his disability.  Even assuming the record supported such an inference (it does not), it does not follow that BNSF or Dr. Jarrard believed that Mr. Duty was substantially limited in his ability to work.  *See Rakity*, 302 F.3d at 1165-66 ("Even if we assume King Soopers disingenuously portrayed the all purpose clerk position as more physically demanding than it actually was, it does not follow King Soopers believed Mr. Rakity was disabled.  At best, these facts only show King Soopers' explanation for refusing a promotion—namely, that Mr. Rakity was unqualified—was mere pretext.  Just because King Soopers may have known Mr. Rakity is actually qualified, it does not follow King Soopers believed Mr. Rakity was also disabled.").

EEOC and Mr. Duty.  In *Justice*, the plaintiff worked as an electrician in one of the defendant's plants.  *Id*. at 1082.  After having a stroke, the plaintiff had a permanent impairment to his ability to balance and suffered from vertigo.  *Id*.  Because the plaintiff's job at the plant required him to navigate catwalks suspended above the floor of the plant and to work regularly around large machines, the defendant became concerned for the plaintiff's safety and disqualified him from "any assignment that requires working at heights or around moving equipment."  *Id.* at 1082-83, 1085.  Although the plaintiff's skills and experience qualified him for any job in the plant, the defendant reassigned the plaintiff to the position of janitor.  *Id*. at 1085. Thereafter, the plaintiff filed suit alleging that the defendant violated the ADA by regarding him as substantially limited in the major life activity of working. *Id*. at 1085-87.

The defendant moved for summary judgment, arguing that there was no evidence that the defendant regarded the plaintiff as disabled from performing a class of jobs.  *Id*. at 1087.  The district court agreed and granted summary judgment.  *Id*.  On appeal, the Tenth Circuit reversed and, in doing so, emphasized that the evidence reflected that the defendant believed that plaintiff's balance and vertigo problems could disqualify him from employment as an electrician not only in the defendant's plant but also in other environments.  *Id.*  In fact, the evidence reflected that the defendant believed that the plaintiff's problems posed a safety hazard in any environment when he was working around "electricity," not just when he was working at heights or around moving equipment.  *Id.* at 1087-89.  Thus, if the plaintiff were in fact incapable of working around electricity due to his impairments, then he would be significantly restricted in his ability to perform a class of jobs—all jobs in the electrical field.  *Id*. at 1088. The Circuit concluded, then, that the plaintiff had presented evidence sufficient to support an

inference that the defendant mistakenly believed him to be substantially limited in the major life activity of working.  *Id*.

EEOC and Mr. Duty contend that BNSF's beliefs regarding Duty are "comparable in scope to those expressed" by the defendant in *Justice*.  As explained above, the evidence in the factual record before the court here reflects only that BNSF, at most, believed that Mr. Duty's impairment disqualified him from any BNSF job which required, as an essential function of the job, the ability to comply with BNSF's three-point contact rule.  But there is no evidence in the record as to what those jobs might be or how many of those jobs exist within BNSF.  Moreover, there is no evidence that BNSF believed that plaintiff would be disqualified from any jobs outside the confines of BNSF. *Justice*, then, is distinguishable.

Because EEOC and Mr. Duty have not come forward with sufficient evidence from which a reasonable jury could conclude that BNSF believed that Mr. Duty's impairment substantially limited Mr. Duty's ability to work in a class of jobs or a broad range of jobs in various classes, the court grants summary judgment on this claim.

## IV.    Use of Medical Evaluation Results

In the pretrial order, EEOC and Mr. Duty assert that BNSF violated ADA § 102(d)(3)(C), 42 U.S.C. § 12112(d)(3)(C), by using the results of its post-offer medical evaluation to disqualify Mr. Duty from the locomotive electrician position on the basis of Mr. Duty's disability.  Specifically, EEOC and Mr. Duty contend that BNSF used the results of the examination to disqualify Mr. Duty based on BNSF's fear or speculation that Mr. Duty posed a risk of injury to himself or others when, in fact, Mr. Duty could perform the essential functions

of the position with or without reasonable accommodation.  29 C.F.R. § 1630.14(b)(3) (under

12112(d)(3)(C), an employer's reasons for withdrawing a conditional job offer must be job-

related and consistent with business necessity); *Garrison v. Baker Hughes Oilfield Operations,*

*Inc*., 287 F.3d 955, 960 (10th Cir. 2002) (results of medical examination may not be used to

disqualify persons who are currently able to perform the essential functions of a job because of

fear or speculation that a disability may indicate a greater risk of future injury or may cause

future workers' compensation or insurance costs) (citing EEOC Technical Assistance Manual).

BNSF moves for summary judgment on EEOC's and Mr. Duty's "use" claim on the

grounds that the claim is duplicative of their disability discrimination claim, no independent

ADA violation has been asserted and, in any event, the claims fail because Mr. Duty is not a

"qualified individual with a disability."  *See Wetherbee v. Southern Co*., 754 F.3d 901, 904 (11th

Cir. 2014) ("We . . . join the Seventh and Tenth Circuits in holding that an individual seeking

relief under § 12112(d)(3)(C) must demonstrate that he is a qualified individual with a

disability.") (citing *Garrison*, 287 F.3d at 960 n.4)).  In response, EEOC and Mr. Duty do not

reference any claim based on BNSF's use of the medical evaluation results but assert instead

that BNSF "improperly collected" medical information from Mr. Duty by making unreasonably

broad inquiries in the medical questionnaire Mr. Duty was required to complete; singling him

out for grip-strength testing; and seeking only that information necessary to support the

revocation of the employment offer.

Summary judgment on these claims is granted.  To the extent plaintiffs assert that Mr.

Duty was singled out for grip-strength testing or that BNSF sought only that information

necessary to support the revocation of the offer, plaintiffs' claims would seem to arise under §

34

12112(d)(3)(A) which permits post-offer, pre-employment medical examinations only if "all entering employees are subjected to such an examination regardless of disability."  Neither EEOC nor Mr. Duty has asserted such a claim in the pretrial order and any claim based on § 12112(d)(3)(A) has been waived.  *Fulghum v. Embarq Corp.*, 785 F.3d 395, 411 (10th Cir. 2015) (claims not included in the pretrial order are waived).[7]  To the extent plaintiffs assert that BNSF asked unreasonably broad questions in its medical questionnaire, plaintiffs direct the court to no authority suggesting that the ADA limits the scope of inquiries an employer may make in the context of a post-offer examination.  *See* 29 C.F.R. § 1630.14(b) (post-offer medical examination does not have to be job-related or consistent with business necessity; but those criteria used to disqualify an applicant must be job-related and consistent with business necessity).  Finally, to the extent plaintiffs intend to press any claims based on § 12112(d)(3)(C), summary judgment is granted as to those claims because Mr. Duty has failed to establish on this record that he is a qualified individual with a disability.

## V.     Failure to Engage in Interactive Process

In the pretrial order, Mr. Duty asserts a claim against BNSF based on its failure to engage in the interactive process contemplated by the regulations implementing the ADA.  *See EEOC v. C.R. England, Inc.* 644 F.3d 1028, 1049 (10th Cir. 2011) ("To facilitate the reasonable accommodation, the federal regulations implementing the ADA envision an interactive process

---

[7] The court notes that the ADA permits "follow-up" examinations that are medically related to the previously obtained medical information and that an employer may ask only some individuals for follow-up examinations; they need not ask all applicants.  *See EEOC v. BNSF Ry. Co.*, 2015 WL 402796, at *2 (W.D. Wash. Jan. 29, 2015) (relying on EEOC Enforcement Guidance).

that requires participation by both parties."); 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation.").   According to Mr. Duty, BNSF, during the medical evaluation process, refused to identify the essential functions of the locomotive electrician position despite his request that BNSF provide a list of the essential functions; refused to permit plaintiff to "prove" his ability to perform the job through on-site demonstration or testing; and otherwise refused to provide reasonable accommodations during the medical evaluation process that would allow BNSF to adequately assess Mr. Duty's ability to perform the essential functions of the locomotive electrician position or to address BNSF's safety concerns.

BNSF moves for summary judgment on this claim on the grounds that Mr. Duty, regardless of BNSF's refusal to engage in the interactive process, has not shown that an accommodation was necessary during the medical evaluation process or that the accommodations he allegedly requested were reasonable in any event.  *See Hennagir v. Utah Department of Corrections*, 587 F.3d 1255, 1265 (10th Cir. 2009) (even if an employer fails to fulfill its interactive obligations to help secure a reasonable accommodation, the plaintiff is not entitled to recovery unless he can also show that a reasonable accommodation was possible); *accord Lowe v. Independent Sch. Dist. No. 1*, 363 Fed. Appx. 548, 552 (10th Cir. 2010) (interactive process is not an independent substantive requirement under the ADA but merely a means to achieve a reasonable accommodation; to establish claim, plaintiff must show that the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the plaintiff).

36

At the outset, summary judgment must be granted on this claim because the record does not support a reasonable inference that Mr. Duty was disabled for purposes of the ADA.  *See Felkins v. City of Lakewood*, 774 F.3d 647, 649 (10th Cir. 2014) (declining to address failure to accommodate issue where plaintiff failed to present sufficient evidence of disability); *Sanchez v. Vilsack*, 695 F.3d 1174, 1177-78 & n.2 (10th Cir. 2012) (to prevail on a failure-to-accommodate claim, plaintiff must demonstrate that he or she is disabled).  But even assuming that Mr. Duty could establish a disability, summary judgment in favor of BNSF would nonetheless be warranted as the evidence presented is otherwise insufficient to permit a reasonable jury to return a verdict for Mr. Duty on this claim.

Mr. Duty contends that he sought and was refused reasonable accommodations during the medical evaluation process.  Under the ADA's implementing regulations, a "reasonable accommodation" in the context of a job application process means any modification or adjustment to that process that enables a qualified applicant with a disability to be considered for the position that the applicant desires.  *See* 29 C.F.R. 1630.2(o)(1)(i).  While Mr. Duty contends that he asked BNSF to provide him with a list of the essential functions of the locomotive electrician position and to permit him to "demonstrate" his abilities to perform those duties, he identifies no accommodation that he needed to fully participate in BNSF's application process or medical evaluation process.  In fact, the evidence demonstrates that Mr. Duty could fully participate in the application process.  Stated another way, Mr. Duty did not request (and clearly did not need) any accommodation to ameliorate the effect of his disability in connection with the application process.  While Mr. Duty was obviously dissatisfied with the results of that process, he points to no authority suggesting that he is entitled to an accommodation to assist him in

"proving" to BNSF that he could perform the essential functions of the position despite the results of the medical evaluation process.

Moreover, Mr. Duty's request for a list of the essential functions of the locomotive electrician position cannot be deemed a request for an "accommodation" in any event. Mr. Duty concedes as much in his response, urging that his request was simply an effort to explore how he might "prove" to BNSF that he could perform the job. This, then, brings plaintiff back to the thrust of his claim—that BNSF should have provided Mr. Duty the opportunity to show that he was able to perform the job by letting him engage in "on-site testing" or an on-the-job demonstration of his skills. While the ADA's implementing regulations permit an employer to ask an applicant to demonstrate how the applicant will be able to perform job-related functions, *see* 29 C.F.R. § 1630.14(a), nothing in the ADA or its implementing regulations requires an employer, at the applicant's request, to permit the applicant to demonstrate how he or she will be able to perform job-related functions. And, in the context of this case, Mr. Duty has not shown that such a request was reasonable in light of BNSF's uncontroverted evidence that such a request necessarily implicates virtually unsurmountable practical and safety concerns.

In that regard, John Reppond, employed at BNSF as a General Foreman III, avers that Mr. Duty would have been required to undergo substantial safety training before he would have been allowed to work on a BNSF locomotive; that new employees undergo five full days of safety training; and that new employees "shadow" an experienced craftsperson when they begin work at BNSF. According to Mr. Reppond, permitting Mr. Duty to attempt to perform locomotive electrician tasks was simply not practical. Mr. Reppond further avers that if BNSF permitted Mr. Duty to attempt to perform locomotive electrician tasks, it would likely disrupt

BNSF's ability to return that locomotive to service in a timely fashion and might run afoul of BNSF's collective bargaining agreement with the union representing locomotive electricians. Mr. Duty has not responded to any of this evidence and has failed to show that his requested "accommodation" is a reasonable one. *See Hennagir v. Utah Department of Corrections*, 587 F.3d 1255, 1264 (10th Cir. 2009) ("When alleging a failure to accommodate, a plaintiff carries the burden of demonstrating the existence of a facially reasonable accommodation.").

Because Mr. Duty has not come forward with evidence from which a jury could determine that a reasonable accommodation was necessary or possible with respect to the BNSF's medical evaluation process, summary judgment on this claim is appropriate.

**IT IS THEREFORE ORDERED BY THE COURT THAT** BNSF's motion for summary judgment (doc. 240) is **granted** and BNSF's motion to exclude expert testimony (doc. 238) is **moot.**

**IT IS SO ORDERED.**

Dated this 21st day of August, 2015, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

39